UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

EMILY DeROGATIS
          Plaintiff,

      -against-                        No. 13 Civ. 8788 (CM)

BOARD OF TRUSTEES of the CENTRAL PENSION
FUND of the INTERNATIONAL UNION OF
OPERATING ENGINEERS and PARTICIPATING
EMPLOYERS, Plan Administrator; JAMES T.
CALLAHAN, Trustee; MICHAEL R. MURPHY,
Trustee; TERRENCE E. McGOWAN, Trustee;
BRIAN E. HICKEY, Trustee; JOHN DUFFY,
Trustee;  ROBERT P. McCORMICK, Trustee;
NOEL C. BORCK, Trustee; PAUL O. GEHL,
Trustee; J. PATRICK TIELBORG, Trustee; PAUL
C. BENSI, Trustee;
          Defendants.
————————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/2/15

EMILY DeROGATIS
          Plaintiff,

      -against-                        No. 14 Civ. 8863 (CM)

BOARD OF TRUSTEES of the WELFARE FUND
of the INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 15, 15A, 15C & 15D, AFL-CIO;
JAMES T. CALLAHAN, Trustee; FRANCIS
DiMENNA, Trustee; JOHN BRUNETTI, Trustee;
          Defendants.
————————————————————————x

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J:

      Plaintiff, Emily DeRogatis, is the surviving spouse of Frank DeRogatis, who died of lung

cancer in September 2011. Plaintiff commenced two separate actions to recover the difference

between the 50% survivor's pension benefits she is currently receiving, and the 100% survivor's

pension benefits that she believes she is due. Her first suit was filed against the Board of Trustees

of the Central Pension Fund of the International Union of Operating Engineers and Participating

Employers (CPF Defendants), 13-cv-8788, and the second was filed against the Board of

Trustees of the Welfare Fund of the International Union of Operating Engineers Local 15, 15A,

15C & 15D, AFL-CIO (Welfare Fund Defendants), 14-cv-8863. By order dated March 3, 2014,

the two cases were consolidated.

Currently before the Court is the CPF Defendants' motion for Summary Judgment, which

was filed on November 25, 2014.

For the reasons set forth below, the CPF Defendant's motion for Summary Judgment is

granted in part and denied in part.

## BACKGROUND

The facts of this case are relatively straight forward and virtually undisputed.

The Central Pension Fund (CPF) of Operating Engineers and Participating Employers is a

multiemployer "employee benefit plan" under ERISA, and it is jointly administered by the CPF

Board of Trustees out of the Washington, D.C. office. (Def. 56.1 Statement ¶ 4.) (Docket # 30.)

Employees at the local union offices hand out the Summary Plan Description (SPD) booklet

describing the CPF and they answer participants' questions about the CPF pension benefits.

(Def. 56.1 Statement ¶¶ 22–23.)  Local employees occasionally refer participants to the CPF

directly when a participant requires additional clarification. (Def. 56.1 Statement ¶ 22.)

Specifically, employees at the Local 15 Welfare Fund office in New York City would follow this

practice of answering general questions about the CPF pension plan. (Def. 56.1 Statement ¶¶ 22–

24.)

Frank DeRogatis was a long-time member of Local 15 of the International Union of Operating Engineers and was a participant in the CPF. (Defendant's 56.1 Statement ¶ 1.) (Docket # 30.) Mr. DeRogatis was diagnosed with lung cancer in January of 2011. (Amended Compl. ¶ 28.) Plaintiff and Frank DeRogatis were married from 1975 until Mr. DeRogatis died in 2011. (Amended Compl. ¶ 27.)

### The March 2011 Meeting and Letter

In March of 2011, Mr. DeRogatis and Plaintiff went to the Local 15 Welfare Fund Office and met with Patrick Keenan, a Local 15 employee. (Def. 56.1 Statement ¶ 30.) Prior to the meeting, Mr. Keenan contacted the CPF and requested a benefit estimate for Mr. DeRogatis so he could review the options with Mr. DeRogatis during their scheduled meeting.

At the meeting, Mr. Keenan described the available welfare and pension benefit options. (Def. 56.1 Statement ¶ 30.) According to Plaintiff, they discussed her husband's cancer diagnosis, but Mr. Keenan did not specify that the 100% survivor's benefit would only be available if Mr. DeRogatis filed his pension application before he died. (Amended Compl. ¶ 41.)

Mr. Keenan sent a letter dated March 17, 2011, summarizing the substance of the meeting. (Def. 56.1 Statement ¶ 33-34.) The letter was typed on stationary under the following letterhead: "WELFARE & PENSION FUNDS, ANNUITY FUND, VACATION FUND, APPRENTICESHIP, SKILL IMPROVEMENT & SAFETY FUND." (Keenan Letter, Docket #28-3)

In the letter, Mr. Keenan set forth the various options available to Mr. DeRogatis, depending on whether he passed away before or after retiring. The letter first sets forth the benefits that Plaintiff "would be entitled to receive if, while actively working, [Mr. DeRogatis] passed away." (Keenan Letter, Docket #28-3) (emphasis in original.) The letter referred to the

3

"Death" section of the SPD, which defines three death benefit options if the participant dies before the commencement of retirement benefits. The first option, which Mr. Keenan references in his letter, is the "Qualified Preretirement Survivor Annuity," which provides a qualified spouse with a 50% benefit. The other two options available when a participant dies before retiring are "Return of Contributions Benefit" and the "Lump Sum Death Benefit." (SPD at 19.) Mr. Keenan's March 17, 2011 letter only called attention to "item number one," which is the 50% survivor's benefit. The other two benefit options are not at play in this lawsuit.

   None of the pre-retirement options is equivalent to a 100% monthly benefit.

   Mr. Keenan's letter then sets out the benefits that Plaintiff "would be entitled to receive if [Mr. DeRogatis] elected to retire." (Keenan Letter, Docket #28-3) (emphasis in original.) The letter refers to the Qualified Joint and Survivor Annuity section of the SPD, which states: "If you have a spouse at your retirement date . . . You must elect to have your spouse receive 50%, 66 2/3%, 75%, or 100% of your monthly benefits." A 100% monthly benefit to a surviving spouse was only available if Plaintiff's decedent elected to retire.

   Throughout the letter, Mr. Keenan refers to a benefit estimate calculated by the CPF, which he attached to the letter. The attached benefit estimate was prepared by Rick Marbury, a benefit supervisor for the CPF (not the Local 15). The estimate letter was addressed to Mr. DeRogatis and copied the Local 15 office; it was sent directly to the Local 15 office in anticipation of the meeting between Mr. Keenan and Mr. and Mrs. DeRogatis.

   Mr. Keenan did not specifically say in the meeting that he was an agent of the CPF, or that he was authorized to speak on behalf of the CPF. No such representation was made in the letter either. (Def. 56.1 Statement ¶ 30, 35.)

4

### Welfare Benefit Notice

By letter dated April 28, 2011, the Local 15 Welfare Fund notified Mr. DeRogatis that his medical coverage had been extended for another year, through April 30, 2012. (Def. 56.1 Statement ¶ 36.)

### The Events of July/August 2011

In late July or early August of 2011,[1] Mr. DeRogatis was hospitalized with pneumonia. (Amended Compl. ¶ 42.) At that time, Plaintiff went to the Local 15 Welfare Fund office and met with a different Local 15 employee, Richard Lopez. (Def. 56.1 Statement ¶ 37.) She brought with her the signed copy of her husband's CPF pension application, although she did not show Mr. Lopez the paperwork. (Def. 56.1 Statement ¶ 38, 40.) Mr. DeRogatis had selected the 100% survivor's benefits option on his pension application. (Amended Compl. ¶ 44.)

Plaintiff testified that she told Mr. Lopez that she wanted to get her husband's retirement paperwork in order because he had stage IV lung cancer. She was waiting for his birth certificate to arrive in the mail before sending it to the CPF office in Washington, D.C. (Plaintiff Response to Def. 56.1 Statement at 19-20.) Mr. Lopez testified that Plaintiff was concerned about whether her husband would lose his medical benefits. (Def. 56.1 Statement ¶ 42.) Mr. Lopez advised Plaintiff not to file the pension papers at that time, explaining that they would both lose their health insurance coverage if Mr. DeRogatis retired prior to the age 62 and before receiving a Social Security Disability award. (Plaintiff Response to Def. 56.1 Statement at 23.)

Plaintiff did not verify the accuracy of the information provided to her by Mr. Lopez regarding their health benefits, nor did she contact the CPF to discuss her husband's pension. (Def. 56.1 Statement ¶ 43-44.)

---

[1] Plaintiff's Amended Complaint describes the following sequence of events as taking place in July. (Docket # 13 ¶ 43.) However, Mr. DeRogatis signed the pension application and dated it August 2, 2011, meaning that the meeting with Mr. Lopez in fact took place in early August of 2011. The difference is of no consequence.

At no point was Plaintiff told that the 100% survivor's benefits would be available if she filed his retirement application after his death.

### Mr. DeRogatis's Death

Mr. DeRogatis died on September 13, 2011. Plaintiff had not yet filed her husband's retirement application; CPF records indicate that the application for benefits was received on September 30, 2014. (Def. 56.1 Statement ¶¶ 45-46.)

CPF processed the application for benefits as a claim for a 50% Qualified Pre-Retirement Survivor Annuity, as is standard practice under the Plan of Benefits when employees die before retiring. (Def. 56.1 Statement ¶ 47.)

### The CPF Plan of Benefits

The SPD summarizes the various sections of the Plan of Benefits in a concise and more palatable fashion. The first page of the SPD states, "The complete legal text of the Plan of Benefits, as most recently amended, and the Trust Agreement are available, free, from the Fund Office upon written request." Although it is not evident that Plaintiff or her husband ever read the Plan of Benefits, there are certain sections that are particularly relevant to how the CPF ultimately processed Plaintiff's application for benefits.

Section 2 of the Plan of Benefits states that the Board of Trustees is responsible for the general administration of the Plan. It then states that the Board, "in administering this Plan with respect to Participants, shall act in a uniform manner under like circumstances with respect to all similarly situated Participants." (Section 2.03)

It then provides, "The Board shall have the responsibility and discretionary authority" for certain decisions, including "making determinations as to the eligibility of an Employee to participate and to receive any benefit provided hereunder, to construe and interpret the terms of

6

the Plan and to afford any such individual dissatisfied with any such determination or interpretation the right to seek review upon written request to the Board," and "receiving applications for benefits under this Plan, whenever such application is required by the terms of this Plan." (Section 2.04(a) and 2.04(c)).

Section 2.07 provides, "Any decision or interpretation made by the Board within the responsibility and discretionary authority granted herein shall be conclusive and binding upon all persons." Section 2.09 states that the Board shall not be liable for its actions or omissions under the responsibilities and authority granted under the Plan, "so long as it acts in good faith and is not guilty of willful misconduct or gross negligence."

Section 9.01 sets forth the forms of retirement benefits available to a participant upon his retirement, including the 50%, 66-2/3%, 75%, or 100% survivor's benefit options. The various options allow for a participant to take a reduced monthly pension, so as to provide the surviving spouse with greater benefits after the participant's death. Section 10.03 provides that an application for retirement benefits must be filed before payments will commence, and "an application is only considered field once it is actually received by the Pension Fund office."

Section 12 then provides information on the various benefit options when an employee dies prior to retirement. Section 12.01 sets forth the Qualified Preretirement Survivor Annuity, which provides a qualified surviving spouse with 50% monthly benefits.

### Plaintiff's Various Attempts to Alter Her Survivor's Benefits

After receiving notice of her 50% survivor's benefits following her husband's death, Plaintiff called the CPF and spoke with Rick Marbury, the benefits supervisor for the CPF participant records department. (Def. 56.1 Statement ¶ 48.) Mr. Marbury informed Plaintiff that,

if she had called the CPF before her husband died, she would have been advised to submit the retirement paperwork as soon as possible. (Def. 56.1 Statement ¶ 49.)

On May 7, 2012, Plaintiff sent a letter to the CEO of the CPF, asking that the CPF issue her 100% survivor's benefit as her husband had selected on the retirement application. (Def. 56.1 Statement ¶ 51.) In her letter she blames her failure to timely file her husband's retirement paperwork on the poor counsel she received from Mr. Lopez. Plaintiff attached a previous letter she had sent to the president of the local union, wherein she questioned, with much exasperation, why Mr. Lopez had not informed her of the other health insurance options available if Mr. DeRogatis did in fact retire (such as Medicare or COBRA insurance).

The CPF denied Plaintiff's request in a July 27, 2012 letter, noting that the Plan states that they must interpret the Plan as written, and the CPF feels she is receiving the benefit to which she is entitled. (Def. 56.1 Statement ¶ 52.) The letter confirmed that had Mr. DeRogatis retired prior to receiving his disability award, they could have lost their health insurance coverage under the Local 15 Welfare Fund. The CPF opined that Medicare coverage was not available to Mr. DeRogatis because of his age, but that they could have elected and paid for COBRA coverage as an alternative.

On September 20, 2012, Plaintiff sent a letter appealing the CPF's decision denying her request for 100% survivor's benefits. (Def. 56.1 Statement ¶ 53.) Plaintiff acknowledged that the CPF processed the benefit application according to the terms of the Plan of Benefits, but again blamed her failure to file the application in a timely fashion on the advice given to her by Mr. Lopez. (Def. 56.1 Statement ¶ 53.) Because Mr. Lopez did not provide complete and accurate information regarding all health insurance options and the consequences of delaying retirement paperwork, she requested that the CPF correct for this "unfortunate oversight."

Plaintiff's appeal was denied on October 31, 2012. Although the CPF's investigation "largely confirmed the factual allegations" asserted by Plaintiff regarding her meetings at the local office, the CPF disclaimed responsibility for the omissions that were allegedly made by the local union employees.

On May 10, 2013, Plaintiff again sent a letter through counsel asking that the Board of Trustees reconsider its previous decision to deny her appeal. (Def. 56.1 Statement ¶ 55.) The letter asserted that Mr. Lopez acted under apparent authority of the CPF when he failed to provide Plaintiff with complete and accurate information and dissuaded her from filing her husband's retirement papers. (*Id.*) To support her agency theory, Plaintiff asserted that the CPF uses the local union offices to provide participants with the SPD and other documents, to advise participants about options under the Plan, and to accept participants' retirement applications on behalf of the CPF.

By letter dated July 2, 2013, the Trustees denied Plaintiff's requested relief, on the grounds that employees at the Local 15 Welfare Fund office are not, and have never been, agents of the CPF. (Def. 56.1 Statement ¶ 56.)

### Procedural History

This lawsuit was filed on December 11, 2013. Plaintiff sued the CPF and its Board of Trustees seeking declaratory judgment that the CPF Board of Trustees breached its duties and obligations under ERISA and that Plaintiff is entitled to receive 100% survivor's benefits under the Fund, seeking back payments of 100% survivor pension benefit, and attorney's fees.

After conducting discovery in this case, Plaintiff filed a second request for reconsideration with the CPF Board of Trustees. By letter dated August 19, 2014, Plaintiff asserted a mutual mistake between Plaintiff and Mr. Lopez about the status of her husband's

health insurance should he retire. (Def. 56.1 Statement ¶¶ 57-58.) Because of the mutual mistake of fact, she asserts that the CPF should be estopped from denying her claim to the 100% survivor's benefits.

The CPF denied the request by letter dated October 24, 2014, again asserting that the Local 15 Welfare Fund Office is not an agent of CPF and the Plan of Benefits was interpreted as written.  (Def. 56.1 Statement ¶ 59.) The letter referred to Mr. Keenan's deposition testimony, where he testified that retirement does not necessarily cause a participant to immediately lose previously earned health insurance coverage, and that Mr. DeRogatis had in fact redeemed Welfare benefit stamps that extended their coverage through August of 2012. However, the CPF Defendants assert that, for Plaintiff to assert a successful estoppel theory, she would have to show that she reasonably relied on information that was provided *by the CPF*, not by the Local 15 Welfare Fund Office.

The companion case against the local Welfare Fund was filed on November 6, 2014. The case contains the same factual allegations, asserting a breach of fiduciary duty theory and seeking appropriate equitable relief. In that lawsuit, Plaintiff seeks declaratory judgment that the Board of Trustees breached its duties and obligations under ERISA, and seeks the difference between the 50% survivor's pension benefits she currently receives and the 100% survivor's benefits she would have otherwise applied for.

By order dated March 3, 2015, the two cases were consolidated.

Currently before the Court is CPF's motion for Summary Judgment. Plaintiff's three asserted claims against the CPF are at issue: (1) a claim for benefits due under the Plan, pursuant to 29 U.S.C. § 1132(a)(1)(B); (2) breach of fiduciary duty under 29 U.S.C. § 1104(a) as enforced

by 29 U.S.C. § 1132(a)(3)(B); and (3) claim for other appropriate equitable relief under 29 U.S.C. § 1132(a)(3)(B).

### The Disputed Facts

The only genuine dispute in this case centers on whether the CPF is liable to Plaintiff, under a breach of fiduciary duty theory, for the alleged mistakes made by employees of the Local 15 Welfare Fund Benefits Office acting under apparent authority of the CPF.

### DISCUSSION

### I.    Standard on a Motion for Summary Judgment

CPF Defendants have moved for summary judgment dismissing Plaintiff's complaint.

A motion for summary judgment shall be granted if the moving party can show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identify those portions of [the evidence], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must then go beyond the pleadings and "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citations omitted).

The court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Gibson v. American Broadcasting Companies, Inc.*, 892 F.2d 1128, 1132 (2d Cir. 1989). There is no genuine issue for trial "[w]here the record taken as a whole

11

could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

## II.   Defendant's Motion for Summary Judgment

### A. First Claim for Relief: Claim for Benefits Due Under the Plan, 29 U.S.C. § 1132(a)(1)(B)—Motion for Summary Judgment Granted

Plaintiff asserts that she is unlawfully being denied 100% survivor's benefits, which she believes she is due under the plan despite her admitted failure to comply with the Plan's filing deadline—her husband's death.

Under ERISA, a plan beneficiary can bring a civil action "to recover benefits due to [her] under the terms of his plan," and "to enforce [her] rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court set forth the applicable framework for reviewing claims under § 1132(a)(1)(B). A denial of benefits claim is "to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. If discretionary authority exists, a district court should approach the claim under an "abuse of discretion" framework. *Id.*

The Second Circuit has stated that, under *Firestone*, when "written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (citations omitted). To trigger the deferential review post-*Firestone*, the plan documents must "give some unambiguous indication that discretion has been conferred." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 739 (2d Cir. 2001).

Section 2.04 of the Plan of Benefits provides that "the Board shall have the responsibility and discretionary authority" to make determinations as to the eligibility of participants to receive benefits under the Plan, and neither party argues that this is an inadequate grant of discretion so as to warrant the more deferential standard of review. Decisions made by the Board are binding, and the Board shall not be liable for its decisions under the authority granted under the Plan so long as it acts with good faith in making determinations. (Plan of Benefits, Section 2.07, 2.09.) The plain text of the Plan certainly provides an "unambiguous indication that discretion has been conferred," and we thus apply an "arbitrary and capricious" standard of review. *See Kosakow*, 274 F.3d at 739.

The Plan documents make it abundantly clear that there are different survivor's benefit options depending on whether a participant dies before retiring or after retiring. It makes clear that retirement paperwork is only considered filed once it is received in the Washington, D.C. office. A plain reading of the language of the Plan leads to the obvious conclusion that a participant cannot elect to retire post-mortem.

The Trustees, whose decision is entitled to *Firestone* deference, did no more than accord the Plan language its fair and natural meaning—and Plaintiff admitted as much in her September 20, 2012 letter appealing the Board's refusal to certify her right to a 100% death benefit.

Under the arbitrary and capricious standard, "Absent a showing of bad faith or arbitrariness, the court will not disturb the trustees' interpretations of a plan as long as they are consistent with the plan's terms and purpose." *Seff v. Nat'l Org. of Indus. Trade Unions Ins. Trust Fund*, 781 F. Supp. 1037, 1040 (S.D.N.Y. 1992). The CPF's decision to treat Plaintiff's application as it would any other application filed by a beneficiary after the participant's pre-

13

retirement death, is clearly not arbitrary and capricious. Indeed, it is required by the Plan, which prohibits the Trustees from treating one beneficiary differently from another.

The motion for summary judgment dismissing Plaintiff's first cause of action is granted.

### B. Second Claim for Relief: Breach of Fiduciary Duty, 29 U.S.C. § 1104(a), as enforced under 29 U.S.C. § 1132(a)(3)—Motion for Summary Judgment Denied

Section 404 of ERISA requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), "with the care, skill, prudence and diligence under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B). Section 502 of ERISA establishes a civil action for participants and beneficiaries to enforce their rights under a Plan. 29 U.S.C. § 1132. Specifically, Section 502(a)(3) authorizes a civil action:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable* relief, (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

*Id.* (emphasis added). The section "has been held to allow plan beneficiaries to bring individual actions arising from an employer's fiduciary breach," *Bell v. Pfizer, Inc.*, 626 F.3d 66, 73 (2d Cir. 2010), and relief is limited to "those categories of relief that were typically available in equity." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993).

The "threshold question" for a claim of breach of fiduciary duty is "not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). The plaintiff must then show that the defendant made a material

misrepresentation, and that the plaintiff reasonably relied on the misrepresentation to her detriment. *See Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122, 126 (2d Cir. 1997).

Here, it is undisputed that no one at CPF made any misrepresentation, material or otherwise, to Plaintiff or to Plaintiff's decedent. The only question is whether the people who did make misrepresentations or omissions—Mr. Keenan and Mr. Lopez—were acting as agents of the CPF when they misled Plaintiff.

### i.   Acting as a Fiduciary Under Actual or Apparent Authority

An individual is considered a fiduciary of a plan if he exercises any discretionary authority or control over the management of the plan or its assets, or if he has any discretionary authority or responsibility in the Plan's administration. 29 U.S.C. § 1002(21)(A). "Communicating information about future plan benefits is indeed a fiduciary obligation." *Flanigan v. General Elec. Co.*, 242 F.3d 78, 84 (2d Cir. 2001) (citing *Vanity Corp. v. Howe*, 516 U.S. 489, 498–99 (1996)). The Second Circuit has "held fiduciaries liable for non-disclosure of information about a current plan when the omitted information was necessary to an employee's intelligent decision about retirement." *Id.* (citing *Becker v. Eastman Kodak Co.*, 120 F.3d 5 (2d Cir. 1997)).

Plaintiff asserts that the misrepresentations made by Mr. Lopez regarding their health insurance coverage, and the omissions made by both Mr. Lopez and Mr. Keenan in failing to tell her that the retirement paperwork must be filed before her husband's death, were binding upon the CPF Defendants in their fiduciary duty owed to Plaintiff, because the Local 15 employees were acting as agents, actual or apparent, of CPF. If the Local 15 employees were agents of CPF, or reasonably appeared to be so, it follows that the advice they gave to Plaintiff and to Mr. DeRogatis was given in a fiduciary capacity.

"Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly." *Highland Capital Management LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010). Actual authority "may be express or implied." *Minskoff v. American Exp. Travel Related Services Co.*, Inc., 98 F.3d 703, 708 (2d Cir. 1996). "Actual authority is express when conveyed orally or in writing and is implied when the grant of authority is shown circumstantially." *Halpert v. Manhattan Apartments, Inc.*, No. 04 Civ. 1850(BSJ) 2011 WL 5928782, at *3 (S.D.N.Y. Nov. 29, 2011). Whether actual authority exists will depend upon "the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009) (citations omitted).

Plaintiff concedes that the CPF Board of Trustees did not confer actual authority on Mr. Lopez or Mr. Keenan (or on any other Local 15 employee) to serve as a pension benefit fund advisor. (Docket # 40 at 4.) Plaintiff does, however, proceed with her claim under an apparent authority theory.

In contrast to actual authority, apparent authority "arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him." *Minskoff*, 98 F.3d at 708 (citations omitted).

To support her claim that that the CPF conferred apparent authority on Local 15 employees, Plaintiff asserts:

> The CPF was aware that participants went to their local union offices seeking advice about their pension options, and the CPF did not in any way discourage Fund beneficiaries from relying on the information they received.

16

The CPF was specifically aware that Mr. DeRogatis was going to the Local 15 office to speak about pension options with Mr. Keenan.

At the request of Mr. Keenan, the CPF sent the Local 15 office pension benefit estimates for Mr. DeRogatis prior to their meeting with Mr. Keenan.

Mr. Keenan included the benefit estimate letter from the CPF in his March 17, 2011 letter to Plaintiff and her husband.

Mr. Keenan's letterhead included the words "WELFARE & PENSION FUND," despite the Local 15 having no pension fund to administer after merging with the CPF in 2001.

The SPD provides that local union offices can submit pension applications to the CPF on behalf of participants.

Mr. Lopez met with Plaintiff to review her husband's CPF retirement application at the Local 15 office.

To contest the assertion of apparent authority, the CPF asserts:

Local unions would answer participants' questions—but they were only "summarizing their own understanding and interpretations" of the Plan of Benefits.

The CPF has held various seminars and conferences over the years where they would inform local union employees that they are not agents or representatives of the Fund.

In 2001, the CPF sent notifications to participants regarding the plan mergers, advising participants that from that point on pensions would be administered out of the Washington, D.C. office.

The Second Circuit has stated that "The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Minskoff*, 98 F.3d at 708. However, "New York courts have also held that 'when . . . the facts are not disputed, the question of agency should be resolved by the court.'" *Flame Cut Steel Products Co., Inc. v. Performance Foams Coatings, Inc.*, 46 F. Supp. 2d 222, 230 (E.D.N.Y. 1999) (quoting *Plymouth Rock Fuel Corp. v. Leucadia, Inc.*, 474 N.Y.S.2d 79, 81 (2d Dept. 1984)).

Here, the evidence creates a genuine issue of material fact to be tried to a jury. *See Liberty Lobby*, 477 U.S. at 248. That is not to say that Plaintiff will necessarily prevail on the issue, but in viewing the evidence most favorably to Plaintiff (as non-moving party), a reasonable inference could be drawn to support the notion that the Local 15 employees (Mr. Keenan and Mr. Lopez) had apparent authority as agents of the CPF.

### ii. Material Representation on which Plaintiff Relied

Despite the open agency question, CPF Defendants would prevail if Mr. Keenan and/or Mr. Lopez made no material misrepresentation to Plaintiff, or if Plaintiff's reliance on what they did (and did not) say was unreasonable. These questions, too, cannot be answered on a motion for summary judgment; genuine issues of fact exist, which can only be resolved at trial.

ERISA fiduciaries have a duty to provide "complete and accurate information" when discussing retirement options with beneficiaries. *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 10 (2d Cir. 1997). "When a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries." *Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76 (2d Cir. 2001) (quoting *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 57 F.3d 1255, 1264 (3d Cir. 1995)).

If there is any disagreement as to what statements were actually made, or as to whether those statements constitute an affirmative misrepresentation, it is a question left for the trier of fact. *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 669 (2d Cir. 1994). *See also Mutual Ben. Life Ins. Co. v. Morley*, 722 F. Supp. 1048, 1051 (S.D.N.Y. 1989). If the evidence reveals that an affirmative misrepresentation was in fact made, "whether it is material is a mixed question of law and fact based on whether there is a substantial likelihood that it would mislead a reasonable employee in

making an adequately informed decision about if and when to retire." *Mullins*, 23 F.3d at 669.

(internal quotations and citations omitted). In other words, "the misrepresentations are material if

they would induce a reasonable person to rely upon them." *Ballone v. Eastman Kodak Co.*, 109

F.3d 117, 122 (2d Cir. 1997).  Therefore, the questions of materiality and reasonable reliance are

intertwined.

Plaintiff asserts that Mr. Lopez advised her that they would lose their health insurance

coverage if she filed the retirement paperwork before receiving a Social Security disability

award.

CPF does not seem to contest the substance of the statements made by the local union

employees to Plaintiff. According to a letter dated October 31, 2012 sent from CPF to Plaintiff,

their "investigation largely confirmed the factual allegations concerning two separate meetings

held at the Local 15 Benefit Fund's office in March and July of 2011."  (Crabtree Decl. Ex. G.)

Plaintiff continues to assert that Mr. Lopez was "dead wrong" regarding the health

insurance coverage advice he gave to Plaintiff at their meeting in July or August of 2011.

In Mr. Keenan's deposition, he described the Welfare Fund eligibility process. (Docket #

40, Exhibit 40.) Eligibility is calculated in blocks of 4, 8, 12, or 16 months, providing benefits

for the future months depending on the number of "stamps" a member submitted. The stamps

represent the number of hours worked during a given week. Given the unpredictable nature of

work flow in the industry, the eligibility process is designed to provide future benefits during

those blocks regardless of whether the member was actually working during a specific week.

Mr. Keenan testified that when a participant was ready to retire, the member may have

continued eligibility depending on whether he had submitted stamps for future benefits. (Docket

# 40, Exhibit 41.) He testified that retirement did not cause pre-paid eligibility to lapse

instantaneously. But, Mr. Keenan opined that it was in fact possible for Mr. and Mrs. DeRogatis to find themselves without health insurance for a given period, depending on the timing of when alternate health insurance would have been processed—implying that Mr. Lopez may not have necessarily been incorrect.

Mr. Lopez similarly testified that an individual with pre-paid stamp eligibility would not lose eligibility upon retirement and it would continue depending on how many stamps the participant redeemed before retiring. (Docket # 40, Exhibit 42.) Mr. Lopez also testified that once a retiree's pre-paid stamps would lapse, they would offer the retiree continued coverage under COBRA.

According to Plaintiff, no explanations of this sort were given to her during her meeting at the local union.

"Fiduciary liability may also arise from a fiduciary's material omissions, or failure to speak." *Bell v. Pfizer, Inc.*, 626 F.3d 66, 75 n.4 (2d Cir. 2010). Whether (1) failing to describe COBRA to Plaintiff, or (2) failing to specifically state that the 100% benefits option was available only to a retiree, amounts to material omissions is a question yet to be determined.

A reasonable jury could conclude that material misrepresentations and omissions were made to Plaintiff.

There also seems to be no question Plaintiff relied on the advice given to her by Mr. Lopez to her detriment: Because of the information she received about their health coverage, Plaintiff decided to wait to file the retirement application until after Mr. DeRogatis passed away, in order to ensure that her ailing husband would continue to receive adequate medical treatment. Had she received complete and accurate information regarding the health coverage and all other

options available, she would have otherwise submitted her husband's retirement paperwork prior to his death.

Whether reliance is reasonable is based in part on how vague a statement was, or whether it contained specific facts. *See e.g.*, *Watson v. Consolidated Edison of N.Y.*, 374 F. App'x 159, 162 (2d Cir. 2010); *Adams v. Niagara Mohawk Power Corp.*, 02 Civ. 1353, 2008 WL 4527694, at *5 (N.D.N.Y. Sept. 30, 2008); *Herter v. Dick's Clothing & Sporting Goods, Inc.*, 58 F. Supp. 2d 306, 312 (S.D.N.Y. 1999).

Here the alleged statements made by Mr. Lopez were not vague—he explicitly warned Plaintiff against filing the retirement application at the time because Plaintiff and her husband would lose their health insurance coverage until and unless they received a Social Security disability award. Whether Plaintiff's reliance was reasonable in light of all of the written materials available to her remains to be seen—but a jury could certainly conclude that it was reasonable reliance given the facts and circumstances.

### iii. Relief for Breach of Fiduciary Duty

Plaintiff seeks to enforce her claim for breach of fiduciary duty under Section 502(a)(3) of ERISA, which provides that a beneficiary can bring a civil action "to obtain other appropriate equitable relief" under the Plan. 29 U.S.C. § 1132(a)(3).

The Supreme Court has cautioned that when a court considers "appropriate" equitable relief, it should "keep in mind the special nature and purpose of employee benefit plans, and [it should] respect the policy choices reflected in the inclusion of certain remedies and the exclusion of others." *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) (internal quotations omitted).

First, Plaintiff requests that the CPF Board of Trustees be estopped from denying that she would have immediately submitted her husband's retirement application but for the advice from

21

Mr. Lopez, that she would have immediately sent in his birth certificate when she received it in the mail about a week after her meeting with Mr. Lopez, and that the retirement application electing 100% benefits was timely received before her husband's death. (Docket # 13, ¶ 80.) She next requests all appropriate equitable relief, including the remedy of surcharge. (Docket # 13, ¶ 82.)

### a.  Equitable Estoppel Claim

The Second Circuit has held "that the principles of estoppel can apply in ERISA cases under extraordinary circumstances." *Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 78 (2d Cir. 1996) (citing *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993)). The elements of an equitable estoppel claim are "(1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; (2) and the other party reasonably relies upon it; (3) to her detriment." *Kosakow v, New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001). Whether a party can make out a claim of equitable estoppel is a question of fact. *Id.*

For the same reasons set forth above, there is a triable question of fact regarding whether equitable estoppel would be an appropriate remedy in this case.

### b.  Surcharge Claim

The Supreme Court recently explained that "not all relief in the form of a money payment is categorically unavailable in § 502(a)(3) actions; a plaintiff proceeding pursuant to that section may, for example, seek a 'surcharge remedy' for a 'loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment.'" *Mcguigan v. Local 295/Local 851 I.B.T. Employer Group Pension Plan*, No. 11-cv-2004(JG)(MDG), 2011 WL 3421318, at *4 n.6 (E.D.N.Y. 2011) (quoting *CIGNA v. Amara*, 131 S. Ct. 1866, 1880 (2011)).

Traditionally in courts of equity, the party moving for a surcharge was not required to show detrimental reliance; "Rather, [equity courts] simply ordered a trust or beneficiary made whole following a trustee's breach of trust." *CIGNA v. Amara*, 131 S. Ct. 1866, 1881 (2011).

Because Plaintiff has raised a genuine issue of material fact, she may be able to recover money relief in the form of equitable surcharge.

The motion for summary judgment dismissing the second cause of action is denied.

### C. Third Claim for Relief: Claim for Appropriate Equitable Relief

Plaintiff's third claim for relief under 29 U.S.C. § 1132(a)(3)(B) is dismissed as duplicative of her second claim for breach of fiduciary duty, which is enforced under the same provision of ERISA.

### CONCLUSION

For the reasons set forth above, the motion for summary judgment as to the CPF is granted in part as to the first and third causes of action, and denied in part as to the second.

The Clerk of the Court is instructed to remove the motion at Docket # 32 from the Court's list of active motions.


Dated: APRIL 2, 2015

BY ECF TO ALL COUNSEL

U.S.D.J

23